J-S04030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KHIRI KASHIER SPAIN | |
| Appellant | No. 1309 MDA 2020 |

Appeal from the Judgment of Sentence entered August 26, 2020
In the Court of Common Pleas of Berks County
Criminal Division at No: CP-06-CR-0003029-2019

BEFORE:  OLSON, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 7, 2021**

Appellant, Khiri Kashier Spain ("Spain" or "Appellant"), appeals from the judgment of sentence entered in the Court of Common Pleas of Berks County on August 26, 2020, following Appellant's convictions of persons not to possess firearms, receiving stolen property, and firearms not to be carried without a license.[1]  Appellant contends that the evidence was not sufficient to support his convictions, that the verdicts were against the weight of the evidence, and that he is entitled to a new trial based on a ***Batson***[2] violation. Upon review, we affirm.

---

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 3925(a) and 6106(a)(1), respectively.  We note that Appellant was also convicted of resisting arrest, 18 Pa.C.S.A. § 5104, but has not raised a challenge to that conviction.

[2] ***Batson v. Kentucky***, 476 U.S. 79 (1986).

The trial court summarized the relevant facts as follows:

On November 1, 2018, deputies from the Berks County Sheriff's Office were on duty when they observed Spain walking in the 800 block of Penn Street, Reading, Berks County, Pennsylvania. They made contact with Spain and asked for his name. He provided them with the name of Tyler. Spain handed over his backpack and gave the deputies permission to open it to retrieve his identification. During the encounter, one of the deputies attempted to handcuff Spain but Spain swung his arms to break away from the deputy and fled.[3] The deputies deployed their taser with no effect. Spain continued to run but, after a struggle, was caught and taken into custody. During the struggle, Spain was observed reaching down towards his legs and waistband. Spain was wearing athletic pants. One of the deputies drew his firearm and commanded Spain to show his hands due to his fear that Spain may be reaching for a weapon. Spain's right shoe came off during the altercation revealing that he had socks on. Spain continued to run until a bystander intervened and assisted in his apprehension.

After Spain was taken into custody, Spain was observed leaning over as if he was tired and trying to shield his body from the deputies. A brief pat-down of Spain's waist was performed and he was placed in the rear passenger seat of the deputies' SUV. Spain's legs and underwear were not checked. Nothing was discovered on Spain during the pat-down. Spain's hands were handcuffed behind his back while in the SUV. Two of the deputies retraced the route they followed while chasing Spain. Spain's backpack was never located.

The deputies transported Spain in the SUV and dropped him off at central processing to be booked before travelling in the same SUV to a separate location to execute a warrant. As they arrived at this location, the deputy operating the SUV slammed on the SUV's brakes to allow the deputies to exit the SUV and make contact with another individual. When they re-entered the SUV, the deputies observed a pink handgun sticking out from

---

[3] Spain, who testified at trial, claimed he lied about his name and ran because he knew there was a warrant for him and he did not want to go to jail, especially in light of the fact his girlfriend would soon be giving birth to their son. Notes of Testimony ("N.T."), Trial, 7/8/20, at 338, 347-49.

underneath the seat Spain was seated in. Between a half-hour to an hour and a half elapsed between the time Spain was placed in the SUV and the discovery of the pink handgun. Nobody else was transported in the SUV during that time.

After the firearm was recovered, law enforcement learned that it was owned by Gerald and Amanda Shaeffer and had been reported stolen. The serial number on the firearm was partially obliterated. Also, law enforcement discovered that Spain did not have a license to carry a firearm.

A DNA sample was obtained from Spain and the firearm was swabbed twice for DNA. The DNA swabs both showed that Spain's DNA was present on the firearm. On the first DNA swab, Spain was one of three DNA contributors. Spain contributed more DNA than the other two individuals. Spain was the only DNA contributor on the second swab of the firearm.

Trial Court Opinion, 11/10/20, at 2-4 (references to notes of testimony omitted).

At the conclusion of trial, the jury returned guilty verdicts indicated above.[4] On August 26, 2020, the trial court sentenced Spain to a cumulative sentence of six to 12 years in prison to be served concurrently with a sentence imposed in a separate action. The trial court denied Spain's post-sentence motions on September 9, 2020. This timely appeal followed. Both Spain and the trial court complied with Pa.R.A.P. 1925.

Spain presents three issues for our consideration.

[1.] Whether the Commonwealth presented evidence that was legally insufficient to support an inference that Appellant ever possessed or received a stolen firearm, where the only inculpatory circumstance was his DNA's [*sic*] being found on a handgun—

---

[4] In addition, the jury found Spain not guilty of aggravated assault and simple assault. 18 Pa.C.S.A. §§ 2702(a)(3) and 2701(a)(1), respectively.

along with the DNA of at least two other people—which did not rule out the equally likely possibility, consistent with Appellant's innocence, that this was owing merely to an accidental DNA-transfer or –drop that occurred at some point during his time in custody in the passenger-seat directly under which the gun was eventually found; and where no evidence at all was present to show that Appellant had guilty knowledge of the gun's [*sic*] being stolen over four weeks earlier?

[2.] Whether Appellant's convictions were against the weight of the evidence, where, *inter alia*, none of the officers involved in his pursuit and arrest ever saw, heard, felt or otherwise perceived the presence of a gun on Appellant at any time; and it would have been practically impossible for Appellant to manage to secrete a gun beneath a the seat of a police-car, while handcuffed and tightly secured, without attracting the notice of the guarding officer seated right next to him?

[3.] Whether the Commonwealth committed an unconstitutional **Batson** violation by peremptorily striking the only black member from a panel of at least forty-eight potential jurors, and failing to offer a valid, non-pretextual, racially neutral explanation therefor, as it did not apply the same supposedly disqualifying criteria to similarly situated white jurors?

Appellant's Brief at 13-14.

In his first issue, Spain challenges the sufficiency of evidence supporting his convictions. Specifically, he contends the Commonwealth failed to present sufficient evidence to establish that he ever possessed a firearm and, therefore, all his convictions fall. Appellant's Brief at 24.[5]

_____

[5] Although Spain contends all his convictions must fail because evidence did not establish he possessed a firearm, he does not offer any argument with respect to the elements of either persons not to possess or firearms not to be carried without a license. Regarding persons not to possess, pursuant to 18 Pa.C.S.A. § 6105(a)(1), a person who has been convicted of offenses enumerated in Section 6105(b) is not permitted to possess or obtain a license

- 4 -

In **Commonwealth v. Newton**, 994 A.2d 1127 (Pa. Super. 2010), this Court reiterated:

> Our standard of review in a sufficiency of the evidence challenge is to determine if the Commonwealth established beyond a reasonable doubt each of the elements of the offense, considering all the evidence admitted at trial, and drawing all reasonable inferences therefrom in favor of the Commonwealth as the verdict-winner. The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented. In doing so, the trier of fact is free to believe all, part, or none of the evidence.

*Id.* at 1131 (quoting **Commonwealth v. Pruitt**, 951 A.2d. 307, 318 (Pa. 2008) (citations omitted), *cert. denied*, 556 U.S. 1131 (2009)).

With respect to receiving stolen property, in **Commonwealth v. Galvin**, 985 A.2d 783 (Pa. 2009), our Supreme Court explained:

> Receiving stolen property is established by proving that the accused "intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed of with intent to restore it to the owner."

---

to possess a firearm in the Commonwealth. At Appellant's trial, uncontroverted evidence established that Appellant was convicted in 2015 of robbery and escape. N.T., Trial, 7/8/20, at 416. Both robbery (18 Pa.C.S.A. § 3701) and escape (18 Pa.C.S.A. § 5121) are among the offenses enumerated in Section 6105(b). With respect to firearms not to be carried without a license, uncontroverted trial testimony confirmed Spain did not have a license to carry a firearm, *id.* at 115, establishing a violation of 18 Pa.C.S.A. § 6106(a).

*Id.* at 792 (quoting 18 Pa.C.S.A. § 3925(a)). "Illegal possession of a firearm may be established by constructive possession." ***Commonwealth v. McClellan***, 178 A.3d 874, 878 (Pa. Super. 2018) (citation omitted).

Concerning constructive possession, this Court has held:

When contraband is not found on the defendant's person, the Commonwealth must establish "constructive possession," that is, the power to control the contraband and the intent to exercise that control. The fact that another person may also have control and access does not eliminate the defendant's constructive possession . . . . As with any other element of a crime, constructive possession may be proven by circumstantial evidence. The requisite knowledge and intent may be inferred from the totality of the circumstances.

***McClellan***, 178 A.3d at 878 (quoting ***Commonwealth v. Haskins***, 677 A.2d 328, 330 (Pa. Super. 1996), *appeal denied*, 692 A.2d 563 (Pa. 1997) (citations omitted)). "Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not." ***McClellan***, 178 A.3d at 878 (citation omitted).

In the context of the case before us, the Commonwealth had the burden of establishing that Spain constructively possessed the handgun and "knew the firearm in question was stolen, or believed that it had probably been stolen. A person 'knows' the goods are stolen if he is 'aware' of that fact." ***Commonwealth v. Robinson***, 128 A.3d 261, 265 (Pa. Super. 2015) (*en banc*) (citing 18 Pa.C.S.A. § 302(b)(2)(i)).

Spain suggests that the presence of his DNA on the handgun does not support an inference of possession and that circumstances must corroborate

constructive possession. Appellant's Brief at 36. "Constructive possession is an inference arising from a set of facts"—not just one equivocal fact—"that possession of the contraband was more likely than not." *Id.* (quoting *McClellan*, 178 A.3d at 878).

The trial court concluded the evidence established Spain's constructive possession of the firearm, noting:

> Spain was wearing socks and athletic pants when he was encountered by the deputies. During Spain's struggle with the deputies, Spain was observed reaching down towards his legs and waistband which raised concern that Spain was reaching for a weapon. After Spain was taken into custody, he was observed attempting to shield his body from the deputies. The jury could have inferred that Spain's actions were consistent with his possession of a firearm. The pat-down of Spain was brief and did not include a check of his legs or underwear where a weapon could have been hidden. He was also wearing socks which could have concealed a firearm. After Spain was placed into the deputies' SUV and transported to central processing, the deputies discovered a firearm beneath the seat where Spain had been sitting. Nobody else was transported other than Spain. Lastly, Spain's DNA was present on the firearm. Therefore, when viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the jury could have determined that Spain was in constructive possession of the firearm when they rendered a guilty verdict on persons not to possess[,] receiving stolen property and firearms not to be carried with a license.

Trial Court Opinion, 11/10/20, at 6-7.[6] Based on our review of the evidence, we agree with the trial court's conclusion regarding constructive possession.

_____

[6] Spain consistently ignores the fact the evidence is to be viewed in the light favorable to the Commonwealth as verdict winner. For instance, focusing on the presence of Spain's DNA on the handgun—and ignoring it was the sole DNA on one of the two swabs—Spain posits an "equally reasonable" inference

Spain also contests an inference of "guilty knowledge," especially with respect to evidence that the gun was "recently stolen." Appellant's Brief at 38-40. Our Courts have discussed an accused's knowledge that property is stolen in the context of "guilty knowledge." For instance, in **Newton**, we explained:

> Guilty knowledge (like all culpable mental states) may be proved by circumstantial evidence. Often, intent cannot be proven directly but must be inferred from examination of the facts and circumstances of the case. When examining the totality of the circumstances to determine if there is sufficient evidence from which a jury could infer the requisite *mens rea,* we must, as with any sufficiency analysis, examine all record evidence and all reasonable inferences therefrom. In conducting our assessment, we stress again that we must view the evidence in the light most favorable to the Commonwealth as the verdict winner. The trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence.

**Newton**, 994 A.2d at 1132 (citations and internal quotation marks omitted).

Further:

> Circumstantial evidence of guilty knowledge may include, *inter alia*, the place or manner of possession, alterations to the property indicative of theft, the defendant's conduct or statements at the time of arrest (including attempts to flee apprehension), a false explanation for the possession, the location of the theft in comparison to where the defendant gained possession, the value of the property compared to the price paid for it, or any other evidence connecting the defendant to the crime.

---

is that "some errant bit of DNA that Appellant was shedding made it on to the gun directly beneath him." Appellant's Brief at 35. "[T]he Commonwealth's experts did not rule out the substantial possibility that some pedal skin-cell, some strand of hair, some serous droplet, fell on to an object placed in such intimate proximity to his person under such cramped conditions." *Id.*

*Robinson*, 128 A.3d at 268 (citation omitted). "Proof that the goods were recently stolen, however, may provide the jury with sufficient circumstantial evidence to support an inference of guilty knowledge, since the 'circumstances of possession as presented by the Commonwealth' (the recency of the theft) suggest 'an explanation for the possession' (that the accused was the thief)." *Id.* at 267 (citation omitted).

"'Recent' is a relative term. Whether possession is recent, and how recent it is, are normally questions of fact for the trier of fact." *Commonwealth v. Williams*, 362 A.2d 244, 249 (Pa. 1976) (citations omitted). In *Robinson*, this Court noted that we have upheld convictions when the Commonwealth establishes the recency of the theft. *Robinson*, 128 A.3d at 268 (citing *Commonwealth v. Hogan*, 468 A.2d 493, 498 (Pa. Super. 1983) (*en banc*) ("We cannot say that as a matter of law a period of four weeks was so great as to render impermissible the inference of guilty knowledge[.]")).

The evidence and reasonable inferences therefrom, viewed in a light most favorable to the Commonwealth as verdict winner, establish that the deputies saw Spain walking down the street and recognized him as having an outstanding warrant. The deputies stopped Spain, who gave a false name and fled from those deputies. Following Spain's capture, the deputies conducted a limited pat-down but observed suspicious movements on Spain's part. Spain was placed in the deputies' SUV and was transported to Central Processing.

Shortly thereafter, the deputies attempted to execute a warrant on another individual. When they spotted the individual, the deputy driving the SUV made a hard stop. When the deputies returned to the vehicle, they observed a pink handgun protruding from under the seat where Spain sat while being transported. The gun had been reported as stolen one month earlier. Part of the serial number on the handgun was obliterated. Two DNA swabs revealed Spain's DNA was present on the gun. One swab reflected he was the main contributor from among three contributors. He was the sole contributor of DNA on the second swab. Considering all the evidence and reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, we find the evidence—both direct and circumstantial—was sufficient to establish all elements of receiving stolen property beyond a reasonable doubt. Spain's first issue fails.

In his second issue, Spain challenges the weight of the evidence. Our Supreme Court has instructed:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. **Commonwealth v. Widmer**, 560 Pa. 308, 319, 744 A.2d 745, 751–52 (2000); **Commonwealth v. Brown**, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. **Widmer**, 560 Pa. at 319–20, 744 A.2d at 752. Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" **Id.** at 320, 744 A.2d at 752 (citation omitted).

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013). "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Widmer*, 744 A.2d at 751. "[A]n appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citation omitted).

> Here, the trial court looked to the evidence and concluded:

> [T]he verdict was not contrary to the evidence as the jury was presented with a case upon which to convict Spain. The jury evaluated the evidence, determined the credibility of the witnesses and, when assessing the weight of the evidence, believed the evidence presented by the prosecution and rendered a guilty verdict. Therefore, the verdicts were consistent with the evidence presented and did not shock anyone's sense of justice.

Trial Court Opinion, 11/10/20, at 8.

Based on our review, we cannot say the trial court "palpably abused its discretion in ruling on the weight claim." Therefore, we shall not disturb its findings. Spain's second issue fails.

In his third issue, Spain argues that the Commonwealth engaged in purposeful discrimination by removing the only person of color from the jury panel, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). "A *Batson* claim presents mixed questions of law and fact. Therefore, our standard of review is whether the trial court's legal conclusions are correct and whether

its factual findings are clearly erroneous." ***Commonwealth v. Edwards***, 177 A.3d 963, 970 (Pa. Super. 2018) (citation and internal quotation omitted). As this Court explained in ***Edwards***:

> When a defendant makes a ***Batson*** challenge during jury selection:
>
>> First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

***Id.*** at 971 (quoting ***Commonwealth v. Watkins***, 108 A.3d 692, 708 (Pa. 2014) (citation omitted)).

Here, Spain, who is black, contends race was the basis for the prosecutor's use of a peremptory strike on the only venireperson who self-identified on the jury questionnaire as black or African-American ("juror number 27"). We first consider whether Spain made a *prima facie* showing that supports an inference the prosecutor struck juror number 27 based on race. Our Supreme Court has instructed:

> To establish a *prima facie* case of purposeful discrimination . . . the defendant must show that he is a member of a cognizable racial group, that the prosecutor exercised a peremptory challenge or challenges to remove from the venire members of the defendant's race;[fn] and that other relevant circumstances combine to raise an inference that the prosecutor removed the juror(s) for racial reasons.

[fn] In a case decided after **Batson**, the Supreme Court held that, while racial identity between the excluded juror(s) and the defendant might help to establish a **Batson** violation, it was not a necessary requirement. **Powers v. Ohio**, 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

**Commonwealth v. Cook**, 952 A.2d 594, 602 (Pa. 2008) (citing **Batson**, 476 U.S. at 96) (internal alterations omitted).[7]

While an inference of discrimination may arise from a pattern of strikes against minorities or the prosecutor's questioning and statements during *voir dire*, **see Commonwealth v. Uderra**, 862 A.2d 74, 84 (Pa. 2004), "[t]he use of a peremptory challenge on a single person of color without more is insufficient to establish a **Batson** violation." **Commonwealth v. Simmons**, 662 A.2d 621, 631 (Pa. 1995).

Here, the trial court found no *prima facie* case of purposeful discrimination with respect to juror number 27. Nevertheless, for the sake of making a complete record, the trial court also considered the second and third prongs of the **Batson** analysis.

> The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, does not demand an explanation that is persuasive, or even plausible. Rather, the

---

[7] In decisions post-dating **Cook**, our Supreme Court has continued to acknowledge that **Powers** extended the rule in **Batson** to cases involving a lack of racial identity between a defendant and venirepersons. **See, e.g., Commonwealth v. Williams**, 86 A.3d 771, 783 (Pa. 2014); **Commonwealth v. Ligons**, 971 A.2d 1125, 1142 n. 14 (Pa. 2009) (plurality). However, because Spain is contending the prosecutor exercised a peremptory challenge to remove a venireperson of his race, **Powers** is not implicated in the instant case.

issue at that stage is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test[.] . . . It is at this stage that the *persuasiveness* of the facially-neutral explanation proffered by the Commonwealth is relevant.

*Commonwealth v. Towles*, 106 A.3d 591, 601 (Pa. 2014) (quoting

*Commonwealth v. Harris*, 817 A.2d 1033, 1043 (Pa. 2002) (internal

citations and quotations omitted) (emphasis in original)).

Regarding the second prong, the prosecutor advised the trial court the peremptory strike was not exercised for racial reasons. Rather, the Commonwealth was trying to impanel jurors older than Spain and jurors without children. Juror number 27 was 28 years old, two years younger than Spain. She had two young children. As the trial court noted, in a prison phone conversation with his girlfriend, Spain asked his girlfriend to bring their young child to court so the jurors could see the child. "The Commonwealth was concerned that juror number 27 and other individuals with children would be more sympathetic to Spain because he has a young child." Trial Court Opinion, 11/10/20, at 11 (references to notes of testimony omitted).

After the Commonwealth tendered its race-neutral explanation, the trial court proceeded to the third prong of the test, weighing the persuasiveness of the facially-neutral explanation. The court determined there were no other circumstances to suggest the Commonwealth removed juror number 27 for

racial reasons. With only one minority juror on the panel, no "pattern of strikes against minorities" could be established. *Id.* Moreover, there were no questions or statements made by the Commonwealth during *voir dire* to support a finding that the Commonwealth struck juror number 27 for racial reasons. *Id.*

As our Supreme Court directed in *Towles*:

Great deference must be given to the trial court's finding as to an absence of discriminatory intent in peremptory challenges, and this finding will not be overturned unless clearly erroneous. Such deference is warranted because the trial court is in the position to make credibility determinations when viewing the demeanor of the prosecutor exercising the peremptory challenges.

*Id.*, 106 A.3d at 602 (citations omitted).

Again, the trial court determined that Spain failed to establish a *prima facie* case of purposeful discrimination with respect to juror number 27. Further, the court reviewed the Commonwealth's use of its remaining peremptory challenges and determined no *Batson* violation occurred. Trial Court Opinion, 11/10/20, at 11. Having reviewed the record and the relevant legal principles, we conclude the trial court's findings are supported by the record and are free of legal error. Therefore, Spain has failed to prove the trial court erred in denying his *Batson* claim. Spain's third issue does not afford him any basis for relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>04/07/2021</u>